# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRETT D. TUCKER, | CASE NO. 3:13-cv-02416-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 6, 7, 9, 10, 11 |

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the applications of Plaintiff Brett D. Tucker for supplemental security income ("SSI") and disability insurance benefits ("DIB") on the ground that Plaintiff could engage in past relevant work as a data entry clerk. In concluding that Plaintiff was not disabled within the meaning of the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"), ALJ had to reject the opinion of every physician who either treated or examined Plaintiff for either mental or physical impairments, and relied instead on state agency physicians who never saw or treated him. The ALJ's determination that Plaintiff could perform his past relevant work as a data entry clerk as actually performed lacks substantial evidence because the ALJ failed to elicit testimony regarding the physical and mental requirements of the job as actually performed. The ALJ's determination that Plaintiff could perform his past relevant work as a data entry clerk as generally performed lacks substantial evidence because the ALJ failed to properly evaluate Plaintiff's testimony and the opinions by all physicians who examined

or treated him that he would be unable to sit for the requisite six hours, particularly without a sit/stand option. This determination also lacks substantial evidence because the ALJ failed to properly evaluate Plaintiff's testimony, the observations of the state agency examiner, and the opinions of all psychiatrists and counselors who treated him that he had difficulty with understanding, comprehension, and abstract thought processes. The ALJ failed to develop a record that would allow the Court to determine whether Plaintiff could perform other work in the national economy. Consequently, the ALJ's decision that Plaintiff was not disabled by virtue of his ability to perform past relevant work lacks substantial evidence.[1]

## II.       Procedural Background

On June 18, 2010 and July 12, 2010, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 174-79). On October 15, 2010, the Bureau of Disability Determination denied these applications (Tr. 87-111), and Plaintiff filed a request for a hearing on November 1, 2010.  (Tr. 112-13). On November 10, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert appeared and testified. (Tr. 40-76).  On December 28, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 19-38). On January 30, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 8-18), which the Appeals Council denied on August 7, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr.

---

[1]The Court notes that Plaintiff was only insured for his Title II claim through December 31, 2008. (Tr. 77). The state agency denied Plaintiff's Title II claim on the ground that there was insufficient medical evidence to establish a diagnosis prior to December 31, 2008.  Although the ALJ may exercise discretion to revisit this determination, it is unlikely Plaintiff will be able to establish a medically determinable impairment or the requisite functional limitations prior to December 31, 2008 to support a Title II claim, particularly in the absence of additional medical evidence.

1-5).

On September 19, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 22, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 6, 7). On January 6, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 9). On February 10, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 10). On February 20, 2014, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 11). On May 5, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 11, 2014, and an order referring the case to the undersigned for adjudication was entered on June 17, 2014. (Doc. 13, 14).

### III.        Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v.

<u>Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999); <u>Johnson</u>, 529 F.3d at 200.

### IV.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>see also</u> <u>Plummer</u>, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. <u>See</u> 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. <u>See</u> 20 C.F.R. §§ 404.1520,

416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Discussion
### A. Physical Impairments
#### i. Medical Records

The ALJ found at step four that Plaintiff could perform his past relevant work as a data entry clerk. (Tr. 26-31). Plaintiff was born on July 29, 1976 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 174). He has at least a high school education and past relevant work as a retail sales clerk, customer service representative, and data entry clerk. (Tr. 44, 62).  Plaintiff's primary physical impairment is back pain caused by obesity.

Plaintiff reported that he had been overweight since he was around the age of eighteen, in 1994. (Tr. 469). On October 30, 2009, Plaintiff was evaluated for the first time by Dr. Barbara Haeckler, M.D.(Tr. 491). He was "stunned to find he weighed over 400 pounds" and was anxious to get started losing weight. (Tr. 491). He reported that he had "some" back pain but wanted to avoid medications if possible. (Tr. 491).

On November 18, 2009, Plaintiff was evaluated by Dr. Haeckler. (Tr. 489). He was morbidly obese and reported that he had very severe back pain. (Tr. 489). He expressed difficulty finding a job in accounting because he was afraid that he had lost his skills and was limited because of his size and back pain. (Tr. 489). He reported that he could not stand for long periods of time. (Tr. 489). Dr. Haeckler wrote that she "agreed to a 6 month period of temporary disability to help him with weight loss, get him to start exercising on a regular basis, and reduce his back pain." (Tr. 489). She completed an Employability Assessment Form the same day. (Tr. 505). She opined that Plaintiff was temporarily disabled as a result of morbid obesity, elevated blood pressure, and back pain. (Tr. 505). She explained that he was unable to do physical labor and unable to stand for long periods of time as a result of these impairments. (Tr. 505). She based this opinion on a physical examination, a review of medical records, and his clinical history. (Tr. 505). She opined that his disability would last for six months, from November 18, 2009 to May 18, 2010. (Tr. 505).

On December 10, 2009, Plaintiff followed-up with Dr. Haeckler. (Tr. 486). She wrote:

> Issues of disability: I told him again that I do not feel that he was disabled in any kind of long-term way. He had been given disability for a six-month period to get his blood pressure under control, start working on his morbid obesity, which should help reduce his back pain. I told him I wanted him to be doing back exercises on a regular basis, take his medication for his blood pressure, and also start to exercise. I feel that he actually is employable. He's unable to do physical labor or stand for long periods of time at this point. I told him he should start looking for a job in the areas that he's been trained in, which is accounting.

(Tr. 486).

On January 19, 2010 and February 26, 2010, Plaintiff followed-up with Dr. Haeckler for his blood pressure. (Tr. 484-85). He had lost weight. (Tr. 484). (Tr. 484). On June 11, 2010

Plaintiff transferred care to Dr. James Owens. Dr. Owens noted that Plaintiff "has had some problems with back pain" and that Dr. Haeckler had wrote out a disability form. (Tr. 482).

On July 22, 2010, Plaintiff was evaluated by Dr. Bradley Jahn, a chiropractor. (Tr. 408, 550). X-rays of Plaintiff's lumbar and thoracic spine revealed no abnormalities. (Tr. 412). MRIs of Plaintiff's lumbar and thoracic spine indicated only mild degenerative change without disk space narrowing. (Tr. 413). However, he had multiple objective findings on exam, including decreased range of motion, slow reflexes, trigger points, tenderness, hyperesthesia, and positive Minor's, Kemp's, ValSalva's, Bechterew's, Yeoman's, and Ely's tests. (Tr. 408). Dr. Jahn noted that Plaintiff's "evaluation reveals musculoskeletal and/or neurological deficits resulting in diminished functional capacity and activities of daily living. His impaired activities of daily living include sleeping, getting dressed, prolonged sitting, prolonged standing, going up/down stairs, reaching, lifting, housework, bathing/showering, unsteady while walking, and he is currently unable to work." (Tr. 408).

On July 30, 2010, Plaintiff followed-up with Dr. Owens for back pain. (Tr. 478). He indicated that his pain occurs "intermittently" with no radiation and was aggravated by bending, standing and doing dishes. (Tr. 478). Plaintiff had tenderness and muscle spasm. (Tr. 479). He referred Plaintiff to physical therapy. (Tr. 480).

On August 2, 2010, Plaintiff had a physical therapy evaluation. (Tr. 410, 531-32). He had full range of motion, except for reduced flexion in his lumbar spine. (Tr. 410). His posture was had "increased thoracic kyphosis and lumbar lordosis." (Tr. 410). He had pain on palpation with only mild tightness and no muscle spasms. (Tr. 410).

On August 26, 2010, Plaintiff followed-up with Dr. Owens. (Tr. 477).  He described his back pain as an "ache" and reported that it is exacerbated by sitting, standing and doing dishes. (Tr. 475). He had tenderness and "minimal discomfort" but no muscle spasm. (Tr. 476).

On September 23, 2010, Plaintiff was discharged from physical therapy. (Tr. 535). He had received eight visits. (Tr. 535). Plaintiff "reported that he was able to perform his basic daily activities without difficulty/pain. However, he was unable to perform tasks requiring prolonged standing or lifting." (Tr. 535).

On October 5, 2010, Dr. Amatul Khalid, M.D., performed a consultative exam. (Tr. 464-472 524-528). He opined that Plaintiff could only stand or walk for twenty to thirty minutes in an eight hour work day and could only sit for one hour in an eight hour work day. (Tr. 464). His opinion was otherwise largely in accordance with the ALJ's RFC assessment. Dr. Khalid noted that Plaintiff was on Flexeril and Naproxen, and indicated that "[t]his has been a chronic pain. Was seeing PT but now sees chiropractor once a month. X-rays of thoracic and lumbar spine showed negative T-spine but mild degenerative change without disc space narrowing. Pain at rest 5-6/10, pain with movement 10/10. Sharp, aching pain." He had a waddling gait, secondary to obesity, and tenderness in his spine. (Tr. 469). Dr. Khalid observed that Plaintiff had a decreased range of motion in his knee, hip, and lumbar spine, but his musculoskeletal exam was otherwise normal. (Tr. 466-67, 469).Dr. Khalid opined that his morbid obesity was "most likely a major contributor due to his chronic pain." (Tr. 471).

On November 1, 2010, Plaintiff followed up with Dr. Jahn. (Tr. 548). He rated his pain as a five on a ten point scale and described it as "moderate." (Tr. 549). He had palpation tenderness, trigger points, limited range of motion, spasm, and muscle weakness. (Tr. 548). Plaintiff reported

moderate pain getting out of bed, getting out of chairs, and sitting for more than a short period of time. (Tr. 549).On November 8, 2010, Plaintiff followed up with Dr. Jahn. (Tr. 548). He rated his pain as a five on a ten point scale. He had palpation tenderness and trigger points, but increased range of motion, decreased spasm, and decreased muscle weakness. (Tr. 548). Dr. Jahn observed "some improvement." (Tr. 548). On January 19, 2011, Plaintiff followed up with Dr. Jahn. (Tr. 547). He reported that his pain was a five on a ten point scale. (Tr. 547). He reported that he can only sit in a chair for a short period of time without pain. (Tr. 547).

On February 20, 2011, Dr. Jahn completed a physical medical source statement. (Tr. 546). He indicated that Plaintiff could frequently lift up to only twenty pounds, although he could occasionally lift one hundred pounds or more. (Tr. 542). He opined that Plaintiff could only stand for two to four hours out of an eight hour work day. (Tr. 542). He opined that Plaintiff could sit for four to six hours out of an eight hour work day. (Tr. 543). He opined that Plaintiff had to alternate sitting and standing to relieve his pain or discomfort. (Tr. 543). He opined that Plaintiff's current restrictions allowed him to work only part-time, not full-time, and would absent more than three days per month as a result of impairments or treatment. (Tr. 546). He attributed Plaintiff's limitations to obesity, joint fixation, and muscle spasms. (Tr. 542-46).

On April 14, 2011, Dr. Jahn completed a second medical source statement. (Tr. 618). He specified that Plaintiff could sit for only four hours out of an eight-hour work day, could only stand for one hour in an eight-hour workday, and could only walk for one hour out of an eight-hour workday. (Tr. 618). He opined that Plaintiff could only occasionally lift up to twenty pounds, and never lift more than twenty pounds. (Tr. 618). He explained that Plaintiff could not

frequently or continuously engage in any postural activities due to his weight. (Tr. 619). He opined that the limitations had lasted or would last for twelve consecutive months. (Tr. 620).

On June 14, 2011, Plaintiff followed up with Dr. Owens for his blood pressure and back pain. He reported intermittent back pain at a severity level of 4. (Tr. 655). He reported that his symptoms are aggravated by bending, flexion, and lifting, but that his symptoms were "relieved by heat and over the counter medication; naproxen sodium." (Tr. 655). Dr. Owens recommended that he continue to exercise and get treatment from his chiropractor. (Tr. 655).

### ii. Analysis

Plaintiff asserts that the ALJ erred in evaluating Dr. Khalid and Dr. Jahn's opinions. The ALJ rejected these opinions, finding that Plaintiff could sit for six hours out of an eight hour workday and did not need a sit/stand option. (Tr. 26). Plaintiff's past relevant work as a data entry clerk requires the ability to sit for six hours out of an eight hour work day. DICOT 203.582-054. The ALJ failed to elicit testimony from the VE regarding whether this position could be performed with a sit/stand option. Thus, if the ALJ improperly rejected either of these opinions, his step four determination will lack substantial evidence.

The ALJ rejected Dr. Khalid's opinion because:

> Such significant restrictions are not supported by Dr. Khalid's own above-discussed relatively benign clinical findings and are not otherwise supported by the other substantial evidence of record. Moreover, Dr. Khalid's assessment was based on a one-time examination of the claimant and was based in large part on the subjective allegations of the claimant, which, as already indicated, are not entirely credible.

(Tr. 31).

Plaintiff asserts that the ALJ failed to evaluate Dr. Khalid's assessment using the relevant factors from 20 C.F.R. §404.1527(f)(2)(ii). (Pl. Brief at 7). He notes that Dr. Khalid's assessment

was not based on subjective complaints, but also a physical exam that revealed multiple objective findings. (Pl. Brief at 8). Specifically, he notes that "Dr. Khalid took Tucker's vital signs, reviewed his past medical history, reviewed his systems, conducted a physical examination, reviewed Tucker's previous medical records, and X-rays of Tucker's thoracic and lumbar spine" and "concluded that Tucker's morbid obesity is most likely a major contributor to his chronic pain." (Pl. Reply at 2). Plaintiff asserts that "[m]orbid obesity is more than just a subjective complaint" and points out that Plaintiff's BMI "places him at the third level of obesity which represents the greatest risk of obesity related impairments." (Pl. Reply at 3) (citing SSR 02-01p). Plaintiff specifically notes that "Social Security Ruling 02-01p also recognizes that obesity can cause major limitation of function and can cause an individual to have limitations in exertional functions such as sitting…" (Pl. Reply at 3). Plaintiff also asserts that the ALJ failed to weigh Dr. Khalid's findings against "other relevant evidence and explain[] why certain evidence has been rejected." (Pl. Brief at 8) (citing Kent v. Schweiker, 710 F,2d 110, 115 (3d Cir. 1983). Plaintiff points out that Dr. Khalid's status as a one-time consulting examiner is not sufficient, alone, to reject his opinion. (Pl. Brief at 9) (citing SSR 96-6p).

In the ALJ's description of Dr. Khalid's findings, he cherry picked the portions that supported his determination and failed to mention that Plaintiff exhibited tenderness, decreased range of motion, and that his morbid obesity was "most likely a major contributor to his chronic pain." (Tr. 29, 471). Thus, the ALJ's rationale that Dr. Khalid's opinion was based only on subjective complaints and contradicts his "benign findings" lacks substantial evidence because he failed to even mention Dr. Khalid's objective findings, which means the Court "cannot tell if significant probative evidence was not credited or simply ignored." Fargnoli v. Massanari, 247

F.3d 34, 42 (3d Cir. 2001) (internal citations omitted). Plaintiff also correctly notes that Dr. Khalid's status as a one-time consulting examiner is insufficient, alone, to reject his opinion. SSR 96-6p.

The ALJ's rationale that his opinion was "not otherwise supported by the other substantial evidence of record" is insufficient because it is conclusory. Moreover, the ALJ never mentions contradictory evidence of record that substantiates Dr. Khalid's opinion. For instance, Plaintiff's physical therapists observed that Plaintiff had kyphosis, which can "increase[] the patient's problems with sitting (poor tolerance and pressure sores) and with urinary drainage." 4-11 Attorneys' Textbook of Medicine (Third Edition) P 11.40. Similarly, in Dr. Jahn's initial evaluation from July 22, 2010, he observed multiple objective findings on exam, including decreased range of motion, slow reflexes, trigger points, tenderness, hyperesthesia, and positive Minor's, Kemp's, ValSalva's, Bechterew's, Yeoman's, and Ely's tests and noted that these findings impaired Plaintiff's ability to engage in "prolonged sitting." (Tr. 408). Treatment notes from Plaintiff's August 26, 2010 visit with Dr. Owens indicate that he reported prolonged sitting exacerbates his back pain. (Tr. 475). At Plaintiff's November 1, 2010 visit with Dr. Jahn, he had palpation tenderness, trigger points, limited range of motion, spasm, and muscle weakness and reported pain with sitting for more than a short period of time. (Tr. 549). On January 19, 2011, Dr. Jahn's treatment notes indicate that he can only sit in a chair for a short period of time without pain. (Tr. 547). The ALJ never mentioned any of this evidence, which again precludes meaningful judicial review. Fargnoli v. Massanari, 247 F.3d at 42.

The ALJ does not have to credit Dr. Khalid's opinion. However, "[a]lthough it is clearly within the ALJ's statutory authority to choose whom to credit when witnesses give conflicting

testimony, the ALJ 'cannot reject evidence for no reason or the wrong reason.'" <u>Mason v.</u> <u>Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993) (citing <u>Cotter v. Harris</u>, 642 F.2d 700, 707 (3d Cir.1981). Here, the Court cannot determine whether the ALJ rejected Dr. Khalid's evidence for a legitimate reason because the ALJ failed to mention substantial evidence that contradicted his rejection. <u>Fargnoli v. Massanari</u>, 247 F.3d at 42. If Dr. Khalid's opinion had been credited, the ALJ's step four determination that Plaintiff could engage in past relevant work would lack substantial evidence. Consequently, the Court concludes that the ALJ's failure to properly evaluate Dr. Khalid's opinion means that his denial of benefits lacks substantial evidence.

The ALJ rejected Dr. Jahn's opinion because:

> Dr. Jahn is not an acceptable medical source, provided no clinical findings in support of such assessment, and such assessment is not otherwise supported by the relatively benign clinical and laboratory findings contained in the record or the limited degree of treatment required.

(Tr. 32). As discussed above, the ALJ ignored Dr. Jahn's earlier objective findings. (Tr. 408, 549). Failing to acknowledge this evidence precludes meaningful judicial review. <u>Fargnoli v.</u> <u>Massanari</u>, 247 F.3d at 42. Although Dr. Jahn is not an acceptable medical source, this alone is insufficient to reject his opinion. SSR 06-03p ("Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources'… depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source…'"). Thus, the ALJ's rejection of Dr. Jahn's opinion also lacks substantial evidence.

**B. Mental Impairments**

Page **13** of **31**

### i. Medical Records

Plaintiff's medical records indicate that he reported significant emotional and physical abuse as a child and received psychiatric services virtually throughout his life, including five months at "Teen Challenge" in Virginia and an inpatient hospitalization from March 18, 1992 to April 22, 1992. (Tr. 437, 553). Behavioral exams "indicated significant impulsive and inattentive behaviors in all settings." (Tr. 317).

An event related potential ("ERP") analysis of his brain in 1995 showed "demonstrable deficits in auditory information processing, despite the patient being on Ritalin SR….This demonstrates the patient's inconsistent response of the brain to stimuli. At times he is able to pay attention and sustain attention and perform well; at other times his brain is laboring inefficiently to process information" and "abnormalities present on the visual side …Clearly, [his medication] is not sufficiently enhancing the patient's information processing." (Tr. 335).

On October 18, 2002, Plaintiff reported to his primary care physician that he had a history of medication for ADD, so he was scheduled for a consultation. (Tr. 342). Testing indicated "severe problems" and "the results of his neurofeedback assessment…[were] similar to individuals who have an attention deficit disorder." (Tr. 356).

On August 26, 2003, Plaintiff was evaluated by Dr. Stephen Overcash at the request of the Office of Vocational Rehabilitation. (Tr. 361). Plaintiff's Straterra was not adequately addressing his attention deficit disorder, as he had "severe problems" in auditory attention and "moderate problems" in visual attention. (Tr. 364). Dr. Overcash opined that Plaintiff "may lack the psychological resources to compensate for his difficulties." (Tr. 364). Plaintiff had "dull normal intelligence and a learning disorder in the visual and visual/motor speed areas…[he] has

had a variety of jobs with some success, but is a slow worker behaviorally and cognitively." (Tr. 365). He opined that "[v]ocationally, I believe a structured workshop setting that has personal and work adjustment training would be most helpful to Brett at this time. He has poor self-discipline and needs someone to help him stay on task and discipline himself." (Tr. 366).

On September 24, 2004, Plaintiff reported that he had been off of his medication for several months and had been getting very depressed and hopeless with some suicide ideation. He was "crushed when he lost his job at the Grove because he couldn't read blueprints. He's working with vocational rehab to try to make it into a trade school." (Tr. 337).

On February 4, 2005, Plaintiff had a vocational evaluation at the Hiram G. Andrews Center. (Tr. 509). Plaintiff struggled with timed tests, testing below average in verbal reasoning, numerical reasoning, abstract reasoning, perceptual speed and accuracy, mechanical reasoning, space relations, and scholastic aptitude, and tested at the third grade level in language skills and the sixth grade level in reading because he was unable to get each section finished. (Tr. 510-11). While taking the intellectual functioning tests, Plaintiff was "moderately anxious" and exhibited signs of frustration, "evidenced by heavy sighs and statements such as, 'You must think I'm stupid,' and 'I can't explain things very well.'" (Tr. 520).

Plaintiff was evaluated using the Emotional Behavior Checklist, which "quantify[ies] behaviors which may have an impact upon [Plaintiff's] overall social and vocational functioning," and his scores indicated a "significant problem." (Tr. 511). The evaluator noted that:

> Behavioral problems were not noticeable at first, however, they grew as the evaluation process progressed. During testing, [Plaintiff] presented as very anxious and the test administrator, along with this evaluator, spoke to Brett and he seemed to calm down. He was fidgety with shaking and tapping legs. [Plaintiff] was observed to have little to no

interaction with peers throughout the evaluation process. He expressed difficulty coping with pressure and responding with inappropriate disruptive behavior at times. During the first two weeks of the evaluation process, Brett presented as anxious and nervous, and exhibited hostility toward this evaluator in his last five days at Hiram G. Andrews Center. He became argumentative, questioning, and angry during the Woodcock Johnson Testing and the final parts of his evaluation. The customer questioned tests used, the tone of voice of the evaluator, became easily agitated, and somewhat verbally aggressive. Brett insisted he meet with the Supervisor of the Evaluation Unit and after doing so, apologized for his actions toward this evaluator, however, the next day Brett reverted back to some of his negative behaviors. Brett became critical, uncooperative, impatient, and angry in the final days of the evaluation process. The customer presented to this evaluator as hostile and argumentative, at times slapping the evaluator's desk, and questioning the reasoning and structure of testing and evaluation process.

With regard to work behavior, the following was observed: Brett questioned instructions repeatedly during the testing process. He had a moderate attention span and appeared motivated to work. He needed much individualized help as he had questions during every aspect of testing. His appearance was satisfactory and he was cooperative with the test administrator. The test administrator reported that he had good interaction with two other students while in the testing room. Brett worked slowly under time restraints, which seemed due to his anxiety about his academic abilities. He often seemed stressed and questioned the test administrator repeatedly. Although he seemed to have a fair understanding of instructions, he occasionally seemed confused, and would forget the initial instructions. [Plaintiff] appeared to be occupied with the amount of questions he answered during the timed tests. The test administrator further reported that Brett never rechecked his work and seemed extremely anxious about doing well on the timed testing.

(Tr. 512-13). Plaintiff attended two "work tryouts," and he "demonstrated satisfactory ability to relate well with superiors and co-workers" and "presented initiate and was punctual on-the-job."

(Tr. 513).  However, the evaluation also indicates that:

Due to the customer's presenting disability, a Perceptual Motor Evaluation was conducted by the Center's Occupational Therapy Department. Results suggest (1) [Plaintiff] should be allowed additional time to visually process information; (2) [Plaintiff] should have all instructions and directions given to him in logical, step-by-step format secondary to decreased sequencing skills.

(Tr. 513-14, 518). Specifically, Plaintiff's visual processing time was 7.40 seconds with 36 correct responses, while an "acceptable response for a 28-year old is 34-36 correct with response time of 2.5-4.0 seconds." (Tr. 518).

Page **16** of **31**

The evaluator concluded that "[r]esults suggest employment at the semiskilled to skilled level on jobs...Due to behaviors observed by several staff members including this evaluator any training should be on a trial training basis with a staffing after three weeks to determine the appropriateness of the training program." (Tr. 515). Plaintiff was "viewed as a person in need of rehabilitative services" who would require "supportive placement and support services" in order to have a "good prognosis for eventual competitive employment." (Tr. 515).

On December 2, 2009, Plaintiff contacted the nursing staff at Keystone Family Medicine and requested that they backdate his disability form. When they refused, he became "very argumentative." (Tr. 487). Plaintiff's case worker contacted Keystone on December 8, 2009, and explained that Plaintiff had been "very pushy with their office as well." (Tr. 487). Later that day, Plaintiff contacted Keystone and was "very demanding." (Tr. 487). When he was informed that Dr. Haeckler would not backdate the form, he "became rude" and demanded to speak to Dr. Haeckler. (Tr. 487). Although Plaintiff argued with the nurse for "over twenty minutes," Dr. Haeckler refused to change the form. (Tr. 487).

On May 27, 2010, Plaintiff saw Dr. Haeckler for the purposes of completing the Employability Assessment. (Tr. 483).  Plaintiff reported that he was having difficulty finding a job because of poor attention, a learning disorder, and poor memory, and that he had been told his IQ was low. (Tr. 483). She wrote:

> Disability assessment. I am concerned about his inability to hold a job. Today is the first that I understood from Brett that he has some learning issues and attention deficit issues that have influenced his ability to maintain employment. I have asked him to bring in the assessments he has had. I will review them and then fill out the Employability Assessment form. I suspect that he needs more help in finding appropriate employment. I am not sure how he should go about this, possibly working through Social Services or sheltered workshop type environment. Brett is actually quite well-spoken and can express himself in writing. He seems to be competent enough just possibly slow at completing

tasks and may need to work in a less stressful environment that is more accommodating to his pace.

(Tr. 483).

The next day, Dr. Haeckler completed the Employability Assessment. She opined that Plaintiff was temporarily disabled, and that his disability was expected to last until at least December 28, 2010. (Tr. 502). She also indicated that he was possibly permanently disabled, and "needs [evaluation] for sheltered work environment. Ability to maintain…employment is questionable." (Tr. 502). She based her opinion on Plaintiff's diagnoses of ADD, schizotypal personality disorder, generalized anxiety disorder, and learning disorder, along with his inability to hold a job, perform adequately at work, his back pain, obesity, and his inability to stand for any length of time. (Tr. 502). She also indicated that her opinion was based on a review of the vocational evaluation report. (Tr. 502).

On June 8, 2010, Dr. Haeckler completed an opinion letter. She noted that Plaintiff had a GED and training in accounting with a "low normal" IQ of 86. (Tr. 500). She opined that Plaintiff "has mental health issues that need to be evaluated before he will be able to work." (Tr. 500). She identified his ADD, generalized anxiety disorder, schizotypal personality disorder, and visual perception and visual/motor speed learning disorders. (Tr. 500).

On June 11, 2010, Plaintiff transferred care from Dr. Haeckler to Dr. James Owens, M.D. (Tr. 482). Plaintiff was "anxious and very persistent and very needy in terms of getting some help." (Tr. 482). Dr. Owens diagnosed Plaintiff with generalized anxiety disorder, depression, hypertension, noncompliance, and morbid obesity. (Tr. 482). Dr. Owens noted that "he needs prolonged care with Psychiatry because this is really outside the realm of what I would be comfortable with treating…[b]ut it may take a while for him to be seen by Psychiatry, so we will

try some therapy in the meantime." (Tr. 482). On July 7, 2010, Plaintiff followed-up with Dr. Owens.  He reported that he was "not seeing a whole lot of significant effect" from his medications, but that he was "not doing badly either." (Tr. 481). He had "some anxiety" and was "very persistent about asking questions" but was "otherwise interactive and pleasant." (Tr. 481).

On July 12, 2010, Dr. Syyeda Syed, M.D., evaluated Plaintiff at Summit Behavioral Health. (Tr. 404). Plaintiff "appeared calm and pleasant," with normal speech, goal directed thought process, and had good attention and concentration during the interview. He was able to complete cognitive tests and his fund of knowledge was fair, but his insight about his illness was "limited." (Tr. 404). He described his mood as "down" and his affect was "dull and constricted." (Tr. 404). The same day, Plaintiff spoke with the state agency reviewing his disability claim. (Tr. 400). He was a "[t]alkative claimant who refused to stop talking. We went over the same things repeatedly." (Tr. 400). At a later face-to-face interview, the state agency examiner observed that Plaintiff had difficulties in "understanding" and "concentrating." (Tr. 214). The state agency work sheet explained that Plaintiff was "excessively thorough in completing the questions from the interview. He seemed to be obsessed with understanding the minute details of SSA's programs, the amounts he would be due, the process involved in getting medical records, etc…." (Tr. 214).

Plaintiff was seen on August 13, 2010 for a biopsychosocial assessment at Franklin Family Services with Martin Young, MS LPC, and Dr. J. Scott Trayer, D.O.  (Tr. 432, 436, 617). Plaintiff reported feeling very depressed with low self-esteem and insomnia, anxious worries/rumination, and a history of ADHD with significant difficulty maintaining concentration and attention to task. (Tr. 436).   Plaintiff reported that he was "quite frustrated and

uncomfortable with his psychiatrist [at Summit Behavioral Health]. If possible, he requests an opportunity to meet with psychiatrist at FFS." (Tr. 437). He reported that he had no recollection of any symptom-free period. (Tr. 437). Plaintiff's mood was depressed, but his speech and thought process were coherent, his intelligence was average or better, and his judgment and insight were fair. (Tr. 438). His concentration was "grossly intact during conversation" but was "reportedly impaired-both by ADHD and depression." (Tr. 438). Plaintiff's "presentation and history [were] consistent with ADHD (Inattentive Type), Learning Disorder (NOS) (by history), Major Depressive Disorder, and Generalized Anxiety Disorder." (Tr. 439). Dr. Trayer assessed Plaintiff with a GAF of 45. (Tr. 434).

On August 18, 2010, Plaintiff saw Mr. Young and brought several assessments from previous mental health services, requesting that he help him "make sense of the technical jargon." (Tr. 616). These evaluations consistently diagnosed Plaintiff with depression, ADHD, and learning disorders, along with shizotypal and avoidant disorders. (Tr. 616). Plaintiff saw Mr. Young again on August 25, 2010, September 1, 2010, and September 8, 2010. (Tr. 614-15).

On September 7, 2010, Dr. Mark Hite, Ed. D, a state agency physician, completed a Mental RFC assessment. (Tr. 441-443). He opined that Plaintiff moderate limitations in social functioning, maintaining concentration, persistence, and pace, and his ability to understand, remember and carry out detailed instructions. (Tr. 441).

Plaintiff saw Mr. Young on September 15, 2010, September 22, 2010, and September 29, 2010. (Tr. 613-14). On September 30, 2010, Dr. Trayer evaluated Plaintiff. (Tr. 458-62). Plaintiff was pleasant, cooperative, and appreciative. (Tr. 461). However, Plaintiff reported that he sometimes stays in bed for "20-24 hours at a time" as a result of his depression. (Tr. 461).

Plaintiff's speech was "slow and somewhat monotone" and his affect was "stiff." (Tr. 461). Dr. Trayer noted that Plaintiff "maintains good eye contact however there was a staring type of quality to him." (Tr. 461). He noted that Plaintiff "tends to get very specific in detail and seems to be having some difficulties with flexibility of thought processes." (Tr. 461). Plaintiff "interpreted proverbs in a very concrete fashion. There were a number of proverbs that the patient could not even find an interpretation for." (Tr. 461). He "present[ed] with a history of difficulty with very concrete thinking" and was "very obsessive in his thought processes." (Tr. 461). He "tends to find transitions difficult. (Tr. 459). Plaintiff saw Mr. Young on October 6, October 13, October 20, 2010, October 27, 2010, and November 3, 2010. (Tr. 609, 611-12).

On November 5, 2010, Dr. Stanton Sollenberger, D.O., evaluated Plaintiff at the Sleep Disorders Clinic. (Tr. 588). He had "no REM sleep whatsoever," moderate fragmentation of his sleep, and "profound hypersomnia." (Tr. 588). Dr. Sollenberger was unsure what caused Plaintiff's sleep disorder, but indicated that Effexor, Wellbutrin, and Trazadone can either decrease REM sleep or cause hypersomnia. (Tr. 588).

Plaintiff saw Mr. Young on November 10, 2010, November 19, 2010, November 24, 2010, and December 2, 2010 (Tr. 606-08). On December 16, 2010, Mr. Young completed a Mental Impairment Questionnaire. (Tr. 539-541). He explained that Plaintiff "experiences marked anxiety, particularly social anxiety, which interferes with concentration and contributes to distractibility, per assessment of client history and presentation." (Tr. 539). He opined that Plaintiff had a marked limitation in maintain attention for two hour segments and working in proximity to others without being unduly distracted. (Tr. 539). He opined that Plaintiff had moderate limitations in understanding and remembering detailed instructions, carrying out

detailed instructions, dealing with the stress of semiskilled and skilled work. (Tr. 539-40). He opined that Plaintiff had no problem with very short and simple instructions. (Tr. 539-40).

On December 29, 2010, Plaintiff updated his treatment plan with Dr. Trayer and Mr. Young. (Tr. 600). The plan indicates that Plaintiff "has made significant progress in recognizing negative/self-defeating self talk" and that Plaintiff has "begun to increase social contacts, and has taken on a part-time data entry job." (Tr. 600). Plaintiff saw Mr. Young on December 31, 2010, January 21, 2011, January 27, 2011, and February 3, 2011. (Tr. 596-99).On February 15, 2011, Plaintiff followed-up with Dr. Trayer. (Tr. 594-95). He had "improved since last visit." (Tr. 594). His attention span, concentration, judgment, and insight were "grossly intact." (Tr. 594). Plaintiff saw Mr. Young on March 11, 2011, March 25, 2011, and April 8, 2011. (Tr. 625-27).

On April 26, 2011, Plaintiff followed-up with Dr. Trayer. (Tr. 641-42). He reported symptoms of depression and feeling tired, but had improved since his last visit. (Tr. 641). His speech, language, and thought processes were normal. (Tr. 641). His attention span, concentration, judgment, and insight were grossly intact. (Tr. 641). Plaintiff saw Mr. Young on April 29, 2011, May 13, 2011, May 20, 2011, May 27, 2011, June 3, 2011, June 10, 2011, June 24, 2011, and July 1, 2011 (Tr. 628-635). On July 14, 2011, Plaintiff saw Dr. Trayer. (Tr. 645). His mood was "changeable without any real provocation." (Tr. 645). He demonstrated decreased motor activity. (Tr. 645).

Plaintiff saw Mr. Young on July 22, 2011, July 29, 2011, and August 6, 2011. (Tr. 636-638, 645). On August 11, 2011, Plaintiff followed-up with Dr. Trayer. (Tr. 647-48). He described his mood as "alright" and was appreciative, but he had "decreased motor activity." (Tr. 647). His thought processes "demonstrate[d] slowing." (Tr. 647). His attention span and

concentration were grossly intact, but his judgment and insight were limited. (Tr. 647). On August 26, 2011, Plaintiff updated his treatment plan. (Tr. 640, 649). Plaintiff's only remaining goal was to obtain a healthier lifestyle. (Tr. 649-50). On October 20, 2011, Dr. Young completed a second medical source statement. (Tr. 659). He explained that Plaintiff "presents with significant history of ADHD and marked social anxiety." (Tr. 659). He indicated an "extreme" limitation in Plaintiff's ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex, work-related decisions. (Tr. 659). He opined that Plaintiff suffers a marked limitation in his ability to interact appropriately with the public, with supervisors, and with co-workers. (Tr. 660).

### ii. Analysis

The ALJ assigned little weight to Mr. Young's opinions and found that Plaintiff had only a moderate limitation in social functioning because he "visits with friends, visits his parents' house, and has a Facebook page and interacts with others on Facebook." (Tr. 25). The ALJ also "observe[d] the claimant at the hearing, and he was able to interact in a socially appropriate manner." (Tr. 25). The ALJ found that Plaintiff had only moderate difficulties in concentration, persistence, and pace because he was able to "complete tasks such as grocery shopping, reading sports, following football, and doing household chores." (Tr. 25). The ALJ did not identify any limitations in processing information or following instructions. (Tr. 25-32). Addressing Mr. Young's opinion specifically, the ALJ wrote only that Mr. Young was not an acceptable medical source and that "his findings were based in part on the claimant's self-report as part of a biopsychosocial assessment, and, as already indicated, the claimant's subjective complaints are not entirely credible." (Tr. 31). The ALJ also wrote that Mr. Young's "limitations appear to

overstate the above-discussed relatively benign clinical findings repeatedly found on mental status examination." (Tr. 32).

As discussed above, the fact that Mr. Young was not an acceptable medical source, alone, is insufficient to reject his opinion. SSR 06-03p. The ALJ's rationale that Mr. Young based his opinion "in part" on Plaintiff's subjective complaints is also insufficient. In a non-precedential opinion, the Third Circuit held that "[a]n ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted." Morris v. Barnhart, 78 Fed. Appx. 820, 825 (3d Cir. 2003)(citing Fair v. Bowen, 885 F.2d 597, 605 (9th Cir.1989)). However, the physician at issue in Morris was a consulting, not treating physician. The Third Circuit has stated in binding precedent that a treating physician's opinion may not be rejected based on a credibility determination. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Moreover, Mr. Young's opinion here was not based only on Plaintiff's subjective complaints. Mr. Young had an opportunity to treat, observe, and examine Plaintiff over an extended period of time on a weekly basis. This leaves only one rationale for discounting Mr. Young's opinion: that it was inconsistent with "benign" findings in the record. Like the ALJ's assessment of Plaintiff's physical impairments, however, the ALJ failed to acknowledge a plethora of records that showed findings that were anything but benign.

In discussing Dr. Syed's July 12, 2010, evaluation, the ALJ cited only the aspects of his evaluation that were normal, and failed to acknowledge that Plaintiff's insight about his illness was "limited," his mood was "down" and his affect was "dull and constricted." (Tr. 28, 404). In discussing Mr. Martin and Dr. Trayer's assessment from August 13, 2010, the ALJ cites only the

aspects of the exam that were normal, and fails to note that Plaintiff reported feeling very depressed with low self-esteem and insomnia, anxious worries/rumination, a history of ADHD with significant difficulty maintaining concentration and attention to task, and frustration with his psychiatrist. (Tr. 436).

In discussing Dr. Trayer's September 30, 2010 evaluation, the ALJ cites only the aspects of the evaluation that were normal. (Tr. 29). He did not mention that Plaintiff reported that he sometimes stays in bed for "20-24 hours at a time," his speech was "slow and somewhat monotone," his affect was "stiff," "there was a staring type of quality to him, " that Plaintiff "tends to get very specific in detail and seems to be having some difficulties with flexibility of thought processes," he "interpreted proverbs in a very concrete fashion," he "present[ed] with a history of difficulty with very concrete thinking" and was "very obsessive in his thought processes." (Tr. 459-462). In discussing Dr. Trayer's August 11, 2011 evaluation, the ALJ cites only the aspects of the evaluation that were normal. (Tr. 29). He does not mention that Plaintiff's his thought processes "demonstrate[d] slowing," he had decreased motor activity, and his judgment and insight were limited. (Tr. 647).

In addition to the above, the ALJ never mentioned that the state agency determined that Plaintiff's nonexertional limitations precluded him from performing his past relevant work because he was limited to unskilled work. (Tr. 87). The ALJ never mentioned that the state agency face-to-face interviewer observed that Plaintiff had difficulties in "understanding" and "concentrating" and that he was "excessively thorough and obsessive." (Tr. 214).  The ALJ never mentioned that the state agency phone interviewer noted that Plaintiff was  a"[t]alkative

claimant who refused to stop talking" requiring that they "go over the same things repeatedly." (Tr. 400).

The ALJ never mentioned that the 1995 ERP analysis showed "demonstrable deficits in auditory information processing" and "abnormalities on the visual side" that cause his brain to "labor[] inefficiently to process information." (Tr. 335). The ALJ never mentioned that his neurofeedback assessment revealed "severe problems" in attending to and processing information. (Tr. 356). The ALJ never mentioned Dr. Overcash's 2003 opinion that Plaintiff has "dull normal intelligence and a learning disorder in the visual and visual/motor speed areas…[he] is a slow worker behaviorally and cognitively." (Tr. 365).

The ALJ wrote that "there is no indication in the medical records relevant herein that the claimant was not able to interact in a socially appropriate manner." (Tr. 25). The ALJ noted that "[a] February 8, 2005 Vocational Evaluation Report from Cheryl Keith, M.S. of Hiram G. Andrews Center is consistent with the ability to engage in a semi-skilled to skilled job. This report reflects satisfactory ability to relate well with superiors and coworkers, initiative and punctuality on-the-job." (Tr. 28).   The ALJ later relied on Plaintiff's "success at Hiram G. Andrews" to discount his credibility. (Tr. 30).

The ALJ did not mention that, at Hiram G. Andrews, Plaintiff struggled with timed tests, testing below average in many areas, as low as a third-grade level. (Tr. 510-11). The ALJ did not mention that the Emotional Behavior Checklist indicated a "significant problem." (Tr. 511). The ALJ did not mention that the evaluator noted that Plaintiff had "difficulty coping with pressure," "inappropriate disruptive behavior" and "hostility toward this evaluator," "became argumentative, questioning, and angry" during testing and " questioned tests used, the tone of

voice of the evaluator, became easily agitated, and somewhat verbally aggressive." (Tr. 512). The ALJ did not mention that Plaintiff "became critical, uncooperative, impatient, and angry in the final days of the evaluation process… at times slapping the evaluator's desk." (Tr. 512).

The ALJ did not mention that Plaintiff "questioned instructions repeatedly during the testing process… needed much individualized help as he had questions during every aspect of testing… worked slowly under time restraints…occasionally seemed confused, and would forget the initial instructions." (Tr. 512-13). The ALJ did not mention that a Perceptual Motor Evaluation suggested he "should be allowed additional time to visually process information" and "should have all instructions and directions given to him in logical, step-by-step format secondary to decreased sequencing skills." (Tr. 513-14, 518). The ALJ cited only the favorable portion of the evaluator's conclusion that "[r]esults suggest employment at the semiskilled to skilled level on jobs" but not the portion of the evaluator's conclusion that "[d]ue to behaviors observed by several staff members including this evaluator any training should be on a trial training basis with a staffing after three weeks to determine the appropriateness of the training program." The ALJ did not mention Plaintiff was "viewed as a person in need of rehabilitative services" who required "supportive placement and support services" to have a "good prognosis for eventual competitive employment." (Tr. 515).

The ALJ did not mention that staff at Keystone Family Medicine, his state disability case worker, and Dr. Haeckler described him as "very argumentative," "very pushy,"  "very demanding," and "rude." (Tr. 487). The ALJ did not mention that Dr. Owens observed Plaintiff to be "anxious and very persistent and very needy in terms of getting some help" on June 11, 2010 and "very persistent about asking questions" on July 7, 2010. (Tr. 482). The ALJ did not

mention that Mr. Young observed that Plaintiff's "communication style" might be having an effect on his case. (Tr. 608). All of these medical records, in addition to Plaintiff's repeated self-reports of inappropriate social interactions, contradict the ALJ's conclusion that "there is no indication in the medical records relevant herein that the claimant was not able to interact in a socially appropriate manner." (Tr. 25). Because the ALJ omitted this contradictory evidence, the Court cannot conclude that "benign findings" justified rejecting Mr. Young's opinion.

Nor do the ALJ's general reasons for rejecting Plaintiff's claimed limitations in concentration, persistence, or pace or social functioning provide sufficient basis for the Court to conclude substantial evidence supports his rejection of Mr. Young's opinion. Cf. Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 305 (3d Cir. 2013) (A Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Here, the ALJ improperly relied on his own observations of Plaintiff under the "roundly condemned 'sit and squirm' method of deciding disability cases." Van Horn v. Schweiker, 717 F.2d 871, 874 (3d Cir. 1983) (internal citations omitted). "Indeed, we have previously warned that, '[i]n cases of alleged psychological disability, such lay observation [by an administrative judge] is entitled to little or no weight.'" Van Horn, 717 F.2d at 874 (citing Kelly v. Railroad Retirement Bd., 625 F.2d 486, 494 (3d Cir.1980)). The ALJ also improperly relied on activities like "grocery shopping, reading sports, following football, and doing household chores." (Tr. 25). Wright v. Sullivan, 900 F.2d 675, 682 (3d Cir.1990) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity…sporadic or transitory activity does not disprove disability").

This error may have been harmless with regard to social functioning, because the ALJ limited Plaintiff to never interacting with the public and only occasionally interacting with co-workers and supervisors. As another District Court in the Third Circuit has explained:

> Ms. Davis further argues that the ALJ's limitation of her potential jobs to those involving only occasional interaction with the public, coworkers, and supervisors is insufficient to account for his finding that she has marked limitations in social functioning. While this Court has held that an ALJ's limitation of a claimant to jobs "not involving ... close supervision or interaction with coworkers, or the general public," would not accurately represent a finding of marked difficulties in social interaction, *Weinberg v. Colvin,* 2013 WL 3972651, at *6 (W.D.Pa. July 31, 2013), other courts have found limitation of a claimant to occasional[3] interaction with the public, coworkers, and supervisors to adequately reflect marked limitations in social functioning. *See Schulte v. Colvin,* 2014 WL 1654129, at *5 (N.D.Ohio Apr.24, 2014); *Barker v. Colvin,* 2014 WL 2832753, at *9 (D.Col. June 23, 2014). Ms. Davis offers no authority to suggest otherwise.[4] Accordingly, the Court concludes that such an RFC finding is sufficient to reflect marked social limitations.

Davis v. Colvin, 2:13-CV-00892, 2014 WL 3891643 at *5 (W.D. Pa. Aug. 7, 2014).

However, the Court need not reach this issue, because the error in rejecting Mr. Young's opinion was not harmless with regard to Plaintiff's ability to process information and follow instructions. Although Mr. Young opined that Plaintiff could carry out simple instructions and tasks, he opined that Plaintiff could not carry out complex instructions and tasks. It is possible that if the ALJ had limited Plaintiff to simple instructions and tasks, he would not have been able to engage in past relevant work as a data entry clerk, which requires a reasoning level of three:

> There is a growing consensus within this Circuit and elsewhere that "[w]orking at reasoning level 2 [does] not contradict the mandate that [a claimant's] work be simple, routine, and repetitive." *Money v. Barnhart,* 91 Fed. App'x 210 (3d Cir.2004). *See e.g. Grasty v. Astrue,* 661 F.Supp.2d 515, 523–24 (E.D.Pa.2009) (Robreno, J.) (concluding the jobs named, with reasoning levels of 2, to be "entirely appropriate," where claimant was limited to simple, repetitive tasks, but not reaching the appropriateness of level–3 jobs for claimant); *Jones v. Astrue,* 570 F.Supp.2d 708, 715–16 (E.D.Pa.2007) (Pratter, J.) (finding no "apparent inconsistency") (and cases cited), aff'd, 275 Fed. App'x 166 (3d Cir.2008). *see also Hackett,* 395 F.3d at 1176 (finding "level-two reasoning appears more consistent with Plaintiff's RFC" limiting her to "simple and routine work tasks"); *Meissl*

*v. Barnhart,* 403 F.Supp.2d 981, 983–85 (C.D.Cal.2005) (Larson, J.) (finding no inconsistency between level 2 reasoning and claimant's RFC limiting her to "simple, repetitive mental tasks").

In contrast, some courts have found a conflict between a VE's testimony that a claimant can perform a job with a reasoning level of 3 and an RFC limiting that claimant to "simple and routine work tasks." *Hackett,* 395 F.3d at 1176; *see also Etter v. Astrue,* No. 10–582–OP, 2010 WL 4314415, at *3 (C.D.Cal.2010) (Parada, Magistrate J.) (listing numerous district court cases within the Ninth Circuit finding a limitation to "simple, repetitive tasks" to be inconsistent with a reasoning level of 3); *McHerrin,* 2010 WL 3516433, at *3 (finding an unresolved conflict between a limitation to "simple, repetitive tasks" and testimony that claimant could perform her past work as a surveillance system monitor, requiring level–3 reasoning); *Green v. Astrue,* No. 10–468, 2010 WL 4929082, at *5 (W.D.Pa.2010) (Ambrose, J.) (finding that "reasoning level of 3 suggests mental demands beyond simple, repetitive, routine work"); *Estrada v. Barnhart,* 417 F.Supp.2d 1299, 1303–04 (M.D.Fla.2006) (Pizzo, Magistrate J.) (agreeing with claimant that "reasoning level 3 exceeds her limitation to simple interactions and tasks").

Simpson v. Astrue, CIV.A. 10-2874, 2011 WL 1883124 at *6 (E.D. Pa. May 17, 2011). Plaintiff also struggled with abstract thinking, but a reasoning level of three requires the ability to understand instructions in diagrammatic form. Stevens v. Astrue, CV 10-8042-SP, 2011 WL 4055804 at *5 (C.D. Cal. Sept. 12, 2011) ("[I]t may be difficult for a person limited to 'simple instructions' to follow instructions in 'diagrammatic form,' as such instructions can be abstract."). Mr. Young's opinion may also support Plaintiff's claim that he meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Consequently, the Court cannot conclude that an error in evaluating Mr. Young's opinion was harmless.

## VIII.    Conclusion

Therefore, the Court finds that the decision of the ALJ lacks substantial evidence. Pursuant to 42 U.S.C. §§ 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 8, 2014                    _____s/Gerald B. Cohn_____
                                           GERALD B. COHN
                                           UNITED STATES MAGISTRATE JUDGE